40131, 40132. PINKERTON NATIONAL DETECTIVE AGENCY, INC. v. STEVENS et al. (two cases).

Decided July 3, 1963.

*Smith, Kilpatrick, Cody, Rogers & McClatchey, Barry Phillips, Thomas E. Joiner,* for plaintiff in error.

*Reeves & Collier, Rex T. Reeves, Merrell Collier, Woodruff, Savell, Lane & Williams, Edward L. Savell,* contra.

RUSSELL, Judge. ■ This court is confronted at the outset by a necessity of meeting or avoiding a collision in case law presented by the defendant's motion to dismiss the petition of the husband J. A. Stevens on the ground that it is barred by the statute of limitation. The motion properly raised this question. *Smith v. Central of Ga. R. Co.,* 146 Ga. 59 (90 SE 474). The petition was filed between two and four years after the injuries to Mrs. Stevens, and seeks actual damages of $50,000, as to which plaintiff alleges that $1,402 represents medical expenses incurred for treatment of Mrs. Stevens' injuries and that "he has lost the consortium of his wife and will be deprived thereof for the rest of her life." No mention is made of loss of services *eo nomine.* In *Nunnally v. Shockley,* 97 Ga. App. 300 (5) (103 SE2d 74) it was stated generally that "services of the wife constitute a part of consortium." Loss of services, however, is a property right subject to a four-year statute of limitation, *Silvertooth v. Shallenberger,* 49 Ga. App. 133 (1, 2) (174 SE 365); *Kelly v. McCoy,* 85 Ga. App. 514, 518 (69 SE2d 652); *Frazier v. Georgia R. &c. Co.,* 101 Ga. 70, 72 (28 SE 684), whereas this court has held that loss of consortium, at least insofar as it involves the wife's loss of the husband's consortium, is an indirect injury to the person subject to a two-year limitation. *Schimel v. Greenway,* 107 Ga. App. 257 (129 SE2d 542). The same right is involved in both instances, and it appeals to justice, logic, and common sense that no fictional difference should be allowed to affect substantial

rights in different manners according to which person happens to be suing for the loss. Our courts have been plagued by the common law concept of loss of services before. In *Hutcherson v. Durden*, 113 Ga. 987, 992 (39 SE 495, 54 LRA 811) it was observed: "Our statute giving a right of action for the seduction of an unmarried daughter, living with her parent, sweeps away the flimsy fiction of the common law, that a suit by a father for the seduction of his daughter can only be based on the relation of master and servant between the two, and must, therefore, be for the loss of the daughter's services, although when the plaintiff has thus brought his suit he can recover for the real wrong and injury inflicted upon him." In the same case comparison is made with actions for criminal conversation, the authority cited holding that Blackstone and Chitty both declare that criminal conversation with the wife is an injury to the person of the husband "and upon this point we are not aware that there is any conflict of authority." In criminal conversation, consortium is the gist of the action, *Hobbs v. Holliman*, 74 Ga. App. 735, 739 (41 SE2d 332), and while *Hobbs* holds this loss to be a property right, as also does *Nunnally v. Shockley*, supra, both seduction and criminal conversation are indirect injuries to the person, *Hutcherson v. Durden*, supra, and it is difficult to see how consortium, which is the gist of the latter, can be a personal right in that cause of action and a property right in this one. An action for loss of consortium may lie without alleging loss of services. In Georgia, as generally, while a husband may recover for the loss of services of his wife, *Code* § 105-107 and citations; *Community Gas Co. v. Williams*, 87 Ga. App. 68 (6) (73 SE2d 119), the wife has no right of action for the services of the husband in supporting and maintaining her, *Brown v. Ga.-Tenn. Coaches, Inc.*, 88 Ga. App. 519, 532 (77 SE2d 24) ; *Bailey v. Wilson*, 100 Ga. App. 405 (111 SE2d 106) ; 14 Mercer Law Review, p. 444, consortium cannot therefore be absolutely linked to loss of services, and this was the basis of *Brown*. The one is an indirect injury to the person and the other is an injury to a property right. The action for consortium must therefore be brought within a two-year period from the date of injury. The opinions in *Nunnally v. Shockley*, supra, and *Hobbs v. Holliman*, supra, are disapproved to the extent that they indicate a holding contrary to that here expressed.

However, a motion to dismiss in the nature of a general demurrer is not good if any part of the petition states a cause of action. *Echols v. Thompson,* 210 Ga. 37 (77 SE2d 521) ; *Neloms v. Mathis,* 98 Ga. App. 465 (105 SE2d 768). Insofar as this action seeks to recover medical expenses, this is a property right subject to a four-year statute of limitation. *Krasner v. O'Dell,* 89 Ga. App. 718 (2) (80 SE2d 852). Cf. *Davis v. Boyett,* 120 Ga. 649, 652 (48 SE 185, 66 LRA 258, 102 ASR 118, 1 AC 386), where in an action for seduction a distinction is made between recovery for the seduction itself, an indirect injury to the person of the father, and recovery for loss of services and expenses incurred in consequence of the action, an injury to a property right, as to which not only the time allowed for bringing the suit but the beginning point of the statute of limitation may be different. It follows that the trial court did not err in overruling the motion to dismiss the petition in case No. 40131.

■ ■ The amended petition set out substantially the following facts: Ruth Stevens was injured in a collision with an automobile driven by one Bell who was insured under a motor vehicle liability insurance policy by the defendant United Services Automobile Association, in which collision she suffered physical injury and severe shock to her "nervous and emotional system." She thereafter filed an action for damages against Bell alleging these facts. The insurance company, through its attorney, employed the defendant Pinkerton National Detective Agency, Inc. to follow the plaintiff and furnish reports of her activities in an effort to determine the extent of injury. Employees of this defendant commenced shadowing plaintiff, stealthily at first and then with progressively increasingly objectionable behavior. She was constantly under surveillance. The detectives would peep through the hedge adjoining plaintiff's home, slink around her house, snoop and eavesdrop upon her activities therein, park near the house where they could watch her through a hole in the hedge, and later park across the street from early morning until late at night, follow her, especially at night, in automobiles staying only a few car lengths behind. In particular, they drove past the house several times on several days before April 13, 1957, and almost every day toward the end

of April; parked different colored automobiles beyond the hedge and peeped through the hedge several times on several days after April 13, and almost every day towards the end of April, during May and June, July 2, six occasions between July 25 and August 13, August 20, and two occasions between August 20 and the first part of September; came on her premises at night near her windows and ran on being observed several nights shortly after May 9 and shortly after June 6, and between July 2 and 10; peeped in the windows of her house several nights shortly after May 9, shortly after June 6, and on July 2, 11, and 12; eavesdropped and listened in on conversations inside the house on July 2 and 11, several nights shortly after June 6, and June 11; went into the woods behind her house on July 2, snooped behind the hedge, eavesdropped, and peeped in, moved about at night in the woods and on the premises around the house several nights between July 2 and 10 and on July 10 in the daytime; on July 2 cut a hole in the hedge alongside the street in order to peep into the windows; came to the door on June 27 pretending to be television salesmen and on July 12 pretending to have business with her; followed her closely in an automobile on given dates, into stores and public places; on July 10 followed her into a named restaurant and were waiting outside a restroom door when she came out, and so on. On one occasion the plaintiff returned home at night and was so closely followed that she ran into the house in panic, hit a piece of furniture, and knocked herself unconscious. On another occasion at a given date her automobile was followed from Atlanta to Forest Park where police intercepted it and the identity of the persons shadowing her was discovered. During the early part of the surveillance plaintiff, who was already emotionally upset as a result of the collision, had a continuous feeling of being followed and spied upon, which her doctor and members of her family thought to be hallucinatory, and she suffered extreme mental torment in the belief that she was losing her mind. Later the disturbance manifested itself in nervous spasms, sleeplessness, nightmares, and the appearance of rash and lesions at dermal nerve endings over her entire body, accompanied by unbearable itching. She was forced to employ both medical and psychiatric aid. After finally discovering the identity of the defendants on

August 13, her attorney contacted the attorneys for defendants and informed them of her condition and that their conduct had almost made her lose her mind, and defendant's attorney stated he would request his client to discontinue these activities; nevertheless, the surveillance was continued in as aggravated a form as before, and plaintiff was forced to undergo electroconvulsive shock treatment from August through November. The conduct of the defendants in shadowing, snooping, spying and eavesdropping upon plaintiff was done in a vicious and malicious manner not reasonably limited and designed to obtain information needed for the defense of plaintiff's lawsuit against Bell but deliberately in a way calculated to frighten and torment her. Plaintiff's neighbors also noticed the espionage and thereby gained the impression that she was engaged in some wrongful activity and began to discontinue any association with her. The shock and injury to her nervous system is permanent.

The petition is brought in two counts, count 2 alleging that the acts complained of were wilful, vicious and malicious, done with the intention of terrifying her to the extent that she would drop the lawsuit against Bell, and count 1 averring that the acts were wilfully done as matter in aggravation of damages but not alleging malicious intention to injure the plaintiff.

Pavesich v. New England Life Ins. Co., 122 Ga. 190 (50 SE 68, 69 LRA 101, 106 ASR 104, 2 AC 561) still remains a leading case on the action for violation of the right of privacy, but it is no longer a lonely pioneer in the field. The many jurisdictions following its lead are impressively listed in Eick v. Perk Dog Food Co., 347 Ill. App. 293 (106 NE2d 742) with the comment that "against this massive weight of authority there is pitted a small, largely inconclusive group of opinions written for the most part before the bulk of the cases upholding the right of privacy were decided." If it is necessary to relate the action to trespass, Byfield v. Candler, 33 Ga. App. 275 (125 SE 905), eavesdropping, McDaniel v. Atlanta Coca Cola &c. Co., 60 Ga. App. 92 (2 SE2d 810), injury to reputation, physical injury resulting from the fright, Candler v. Smith, 50 Ga. App. 667 (179 SE 395), these elements appear in the petition. Prosser, Law of Torts, 2d Ed., p. 639, states that the tort actions grouped in this field are

only a phase of the larger problem of the protection of peace of mind against unreasonable disturbance. "When the 'new tort' of the intentional infliction of mental suffering becomes fully developed and receives general recognition, the great majority of the privacy cases may very possibly be absorbed into it. . . There remains, however, a large and growing field in which privacy becomes important because no other remedy is available." Whether or not there is express malice, that is, a motive to harm the plaintiff by the activity engaged in, is immaterial, because the absence of the motive will neither insulate the defendant if the tort is in fact committed nor will its presence create a cause of action if none otherwise exists. Gill v. Curtis Pub. Co., 231 P2d 565, 138 ALR, Anno., 22, 47. "Each person has a liberty of privacy, and every other person has as against him liberty in reference to other matters, and the line where these liberties impinge upon each other may in a given case be hard to define; but that such a case may arise can afford no more reason for denying to one his liberty of privacy than it would to deny to another his liberty, whatever it may be. In every action for a tort it is necessary for the court to determine whether the right claimed has a legal existence, and for the jury to determine whether such right has been invaded, and to assess the damage if their finding is in favor of the plaintiff. This burden which rests upon the court in every case of the character referred to is all that will be imposed upon it in actions brought for a violation of the right of privacy." *Pavesich,* supra, p. 200. Acts merely resulting in fright or shock are not actionable in the absence of wilful and intentional misconduct on the theory that there has been no injury to purse or person. *Goddard v. Watters,* 14 Ga. App. 722 (82 SE 304). But where physical *or mental* impairment flows naturally as a direct consequence of the tort, there has been *injuria* in its legal sense, and recovery may be had both for it and the accompanying fright and mental suffering. *Hines v. Evans,* 25 Ga. App. 829 (105 SE 59); *Williamson v. Central of Ga. R. Co.,* 127 Ga. 125 (56 SE 119). Allegations of permanent mental impairment having physical manifestations and necessitating medical care, treatment by electric shock therapy and psychiatric aid are allegations of fact, as opposed to the type

of allegation held by the court in *Hamby v. Edmunds Motor Co.*, 80 Ga. App. 209 (55 SE2d 743), to be conclusions, which show injury resulting in mental impairment as opposed to mere fright, shock and hurt feelings. The tort and resulting damage are thus sufficiently alleged in both counts of each of the petitions.

(c) It is contended by the plaintiff in error that under one of the well recognized exceptions to the right of privacy the defendants were justified in their actions, especially those alleged in count 1 for the reason that the plaintiff filed a damage suit against Bell alleging certain physical injuries and the defendant in that suit and his insurance company and Pinkerton, who was employed by the latter, had a right to make such investigation as it deemed necessary in order to ascertain whether the claim for damages was well founded. The recently decided case of Forster v. Manchester (Pa. S. C.), 189 A2d 147, upholds this view. In that case the detectives employed by the insurance company assigned a team of two men to take moving pictures of the plaintiff for possible use in a pending damage suit and at least twice followed her very closely in traffic, causing her to become extremely nervous and upset so that she required medical treatment. There as here the defendants were notified by letter of the effect of their conduct on the plaintiff but ignored it, and the plaintiff was aware of being followed on four subsequent occasions. The court stated, with two justices dissenting: "By making a claim for personal injury appellant must expect reasonable inquiry and investigation to be made of her claim and to this extent her interest in privacy is circumscribed. It should also be noted that all of the surveillances took place in the open on public thoroughfares where appellant's activities could be observed by passersby. To this extent appellant has exposed herself to public observation and therefore is not entitled to the same degree of privacy that she would enjoy within the confines of her own home. . . . There was nothing unreasonable in the manner in which appellant was followed nor in the taking of motion pictures. In regard to the surveillance, it was conducted by experienced investigators who did not use improper techniques . . . there was no trespassing on appellant's property nor spying through her windows." The test of reasonableness is that stated in Restatement of the

168

Law, Torts, 392, § 867. It is implicit in Souder v. Pendleton Detectives, 88 S2d 716, where the cause of action in a similar case was upheld because of allegations suggesting a violation of the Louisiana "Peeping Tom" criminal statutes. In Schultz v. Frankfort Marine Acci. &c. Ins. Co., 151 Wis. 537 (139 NW 386), which alleged "rough shadowing" on the part of the detectives for the purpose among others of intimidating the plaintiff from leaving town, the court held that, omitting the alleged acts of trespass and eavesdropping, threats, slander and alleged restraint of the plaintiff's liberty, the open and repeated acts of surveillance were sufficient of themselves to publicly proclaim the plaintiff suspect and subject him to public disrepute so as to constitute "the analogue of libel." This petition does not limit the defendants' acts to that reasonable and unobtrusive observation which would ordinarily be used to catch one in normal activities unaware, but sets out a course of conduct beyond what would be sufficient for the purpose intended, and certainly one which would disturb an ordinary person without hypersensitive reactions. Both counts of both petitions set out a cause of action, and the general demurrers were properly overruled, as well as the special demurrers directed to the paragraphs setting out the damage resulting to Ruth Stevens, those attacking allegations of wilful misconduct as being conclusions without supporting facts, and the allegations as to the impression given the plaintiff's neighbors by the open and continued surveillance on the ground that the facts alleged are immaterial, irrelevant, duplicitous and inconsistent.

■ Both counts of each petition make substantially the same allegations as to the nature of the defendants' acts, but in count 1 it is alleged that the allegations of intent are "for the purpose of showing aggravation of damages and not for the purpose of stating a cause of action based on a separate wilful and intentional tort." Plaintiff in error in its brief states: "If the effect of these amendments together with the order of the court is to distinctly separate in the two counts any cause of action which plaintiffs may have for a wilful and intentional injury from any cause of action which plaintiffs may have for any conduct of Pinkerton which was not wilful and malicious so that each theory

may be tested by general demurrer and so that Pinkerton would be entitled to a nonsuit or directed verdict on counts 2 of the plaintiffs' petitions in the absence of any wilful and malicious conduct on the part of its employees, then the court below properly overruled the demurrers directed to duplicity." We have adopted this view of the pleadings in passing on the general demurrers and believe that the trial court also correctly adopted this view in overruling these special demurrers. That judgment is affirmed.

■ Allegations as to time when the various activities of the defendant took place are substantially set out in Division 1(a) of this opinion. The holding in *Wright v. Lester*, 218 Ga. 31 (3) (126 SE2d 419), a case involving alienation of affections, was that as to the date of meetings between the spouse and the defendant an allegation that the times were not known to the plaintiff but well known to the defendant but occurred within a period between July 19 and October 10, 1958, was insufficient. The allegations as to time in the present case are much more definite, and the exact date of a number of specific occurrences is mentioned. The special demurrers complaining that the plaintiff has not pleaded the time of the defendant's activities are without merit.

■ The plaintiff alleges that the mental impairment and emotional injury for which she sues were caused by the acts of these defendants and not by the injuries and shock to her nervous and emotional system which she suffered and for which she recovered a verdict in the damage suit arising out of the automobile collision. Since it does not appear on the face of the petition that this is untrue, special demurrers contending that the plaintiff is seeking damages for injuries which have already been compensated are without merit.

■ The plaintiff submitted an interrogatory calling for "the name, address and date of commencement of investigation of each person residing in Atlanta, Georgia, as to whom Pinkerton National Detective Agency, Inc. has made an investigation during the years 1957 to 1962 inclusive, under employment on behalf of attorneys and others engaged in the defense of a lawsuit by such person seeking to recover damages for alleged personal in-

juries; and also give, in connection with the name of each such person, the name of the person, firm or corporation who employed Pinkerton National Detective Agency, Inc. to make such investigation." Objections were made on grounds that the question sought disclosure of irrelevant and impertinent information not reasonably calculated to lead to the discovery of admissible evidence, disclosure of the work product of an attorney, and a disclosure of confidential business information. The order of the court required an answer with the exception of investigations presently in progress and suits pending. The "work product" and confidential information objections are not good; it is not shown that the matter sought to be elicited was confidential, and the "work product" rule refers generally to matter in the files of an attorney directly procured or assembled by him. Hickman v. Taylor, 329 U.S. 495 (67 SC 385, 91 LE 451). See also *Setzers Super Stores v. Higgins*, 104 Ga. App. 116 (121 SE2d 305). The subject matter sought to be elicited from the defendant corporation refers to matters personal to third parties with whom this plaintiff would ordinarily have no concern, and they as well as the defendant would have a right equally deserving of respect by the courts to withhold from the public such personal information. "In a controversy between two persons regarding a given subject matter, evidence as to what occurred between one of them and a third person with reference to a similar, though entirely distinct, transaction, is irrelevant." *Merchants Nat. Bank of Rome v. Greenwood*, 113 Ga. 306 (38 SE 826). The conduct of parties in other transactions is irrelevant, "unless the nature of the action involves such character and renders necessary or proper the investigation of such conduct." *Code* § 38-202. The pleadings do not allege that the defendant in carrying on this investigation in the manner it did, followed a general policy of coercing and harassing persons being shadowed in connection with damage suits, so as to raise the question of good faith in the conduct of its business generally.

It is further contended that the evidence procured by investigation, provided the plaintiff was furnished with the names of other persons shadowed by the defendant, would be admissible to impeach the statement of the defendant's manager made in an af-

fidavit in support of the motion for summary judgment, to the effect that "such investigations are never conducted for the purpose of or with intention of frightening or harassing claimants." The affidavit would not itself be admissible on the trial, and testimony as to other transactions, even on cross examination, would not ordinarily be relevant within the framework of the pleadings here. Further, this statement, if offered as testimony on the trial, would be no more than a conclusion of the witness and, as such, inadmissible if objected to. It was error not to sustain the objections to this portion of the interrogatory.

The trial court did not err in overruling the demurrers to the petitions in Cases Nos. 40131 and 40132, but did err in requiring answers to the interrogatory.

*Judgment affirmed in part; reversed in part. Felton, C. J., Carlisle, P. J., Nichols, P. J., Bell, Frankum, Jordan, Hall and Eberhardt, JJ., concur.*